UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION COMMON CAUSE/NEW YORK, COMMUNITY VOICES HEARD, CITIZEN ACTION OF NEW YORK, and JENIFER BENN,<br><br>Plaintiffs,<br><br>v.<br><br>RENSSELAER COUNTY BOARD OF ELECTIONS; JASON SCHOFIELD in his official capacity as Commissioner of the Rensselaer County Board of Elections; STEVEN MCLAUGHLIN, in his official capacity as Rensselaer County Executive; FRANK MEROLA, in his official capacity as Rensselaer County Clerk; and MICHAEL STAMMEL, in his official capacity as Chairperson of the Rensselaer County Legislature,<br><br>Defendants. | Case No. 1:19-cv-920 (DNH/CFS)<br><br>**COMPLAINT** |

## INTRODUCTION

1.      For over a quarter century, federal law has guaranteed eligible citizens the opportunity to register to vote at their state department of motor vehicles. "Motor Voter" programs have made voting more accessible to millions of Americans and made our democracy stronger and more representative. In Rensselaer County, New York, however, the simple act of registering to vote at the Department of Motor Vehicles (DMV) is now fraught with significant risk. Under a plan announced last week, citizens residing in Rensselaer County must subject themselves to the possibility of federal investigation if they wish to register through New York's Motor Voter program. At a time of heightened fear over federal immigration enforcement, including sweeping raids of households, mistaken detention, and even deportation of U.S.

1

citizens, Rensselaer County officials have pledged to turn over voter registration data of United States citizens to U.S. Immigration and Customs Enforcement (ICE) on an immediate and ongoing basis, in flagrant disregard of both federal and state laws prohibiting such disclosures. The purpose and predictable effect of this conduct is to intimidate eligible citizens out of registering to vote.

2.      The Defendants are the Rensselaer County Board of Elections, Rensselaer County Board of Elections Commissioner Jason Schofield, Rensselaer County Executive Steve McLaughlin, Rensselaer County Clerk Frank Merola, and Rensselaer County Legislature Chairperson Michael Stammel. On July 18, 2019, the Defendant officials announced by press release that "[e]ffective immediately," the Rensselaer County Board of Elections would begin providing ICE with voter registration information, including names and addresses, of all individuals who register to vote at the DMV. Defendant Stammel stated that the County is "pleased that we will be working with I.C.E. to provide this information." Defendant McLaughlin stated that the County would "work hand and hand with the brave men and women of I.C.E. ensuring they have all the tools and resources at their disposal to protect the integrity of our voting process." Defendant Merola revealed the depth of the expected involvement of ICE, stating that the Defendants intended to have "I.C.E. assist in reviewing voter registration documents." Defendant Schofield stated that he and the Board of Elections would "fully cooperate with I.C.E. on this important matter."

3.      Defendants' conduct violates federal law in at least two ways. It threatens to intimidate eligible voters out of registering to vote at the DMV, in violation of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b). And subjecting all Motor Voter

registrations to federal immigration scrutiny unconstitutionally burdens the fundamental right to vote in violation of the First and Fourteenth Amendments.

4.      Tying voter registration to threats of investigation by federal immigration officials is frightening and will intimidate eligible voters out of participating in the electoral process. It will deter eligible U.S. citizens from registering to vote at the DMV, because those citizens do not want to be subjected to indiscriminate scrutiny by ICE and they reasonably fear the catastrophic consequences that could follow—even if they have done nothing wrong. ICE is a law enforcement agency with the power to conduct investigations, raid homes and workplaces, arrest and detain individuals, divide families, and deport people. Its databases are notoriously error-prone and out of date, resulting in detainers being wrongfully placed on hundreds, if not thousands, of U.S. citizens each year. ICE has in fact deported U.S. citizens based on inaccurate information.

5.      United States citizens in Rensselaer County with mixed immigration-status families are particularly likely to be intimidated by Defendants' sharing of their voter registration information with ICE. Many citizens are related to, or live with, noncitizens, including legal permanent residents, asylees, refugees, beneficiaries of the Deferred Action for Childhood Arrivals (DACA) program, people with Temporary Protected Status, or people who are undocumented. The predictable result of Defendants' actions will be to cause these citizens to refrain from registering to vote in Rensselaer County for fear of triggering an ICE investigation that could threaten their loved ones.

6.      Some citizens may refrain from registering to vote because they are afraid they themselves could be targeted for denaturalization proceedings or immigration enforcement based on erroneous information about their status—reasonable fears given known inaccuracies in ICE

databases and the zero-tolerance policies of the current administration, as well as well-founded concerns about racial or ethnic profiling.

7.     Engendering fear among voters for availing themselves of the lawful and legally protected opportunity to register to vote through the Motor Voter program is not only the obvious consequence of Defendants' scheme to disclose voter registration information to ICE; it is the clear intent. That this is so is all the more evident because the Defendants have no lawful, legitimate basis for their scheme. Voter registration information is sensitive and is protected from inappropriate disclosure by both New York election law and the National Voter Registration Act of 1993 (NVRA). The NVRA, which requires states to establish Motor Voter programs, expressly prohibits the disclosure of information concerning the agency or office at which a voter registers, and proscribes the use of information collected through a Motor Voter program for any purpose other than voter registration.

8.     Defendants' purported rationale for sharing voter registration data with ICE—that a new state law that allows undocumented immigrants to apply for drivers' licenses will somehow lead noncitizens to register to vote—is pretextual. Noncitizens have long been eligible to apply for drivers' licenses in New York and there is no evidence that this policy has resulted in a surge of fraudulent voter registration by noncitizens. Twelve other states and the District of Columbia already provide driver's licenses to undocumented persons, with no resulting spike of undocumented persons registering to vote. Indeed, a noncitizen who registers to vote already violates federal law and is subject to significant penalties. Furthermore, ICE is responsible for enforcing federal immigration laws. It plays no role in administering voter registration or elections, or in enforcing election laws, and it does not offer citizenship verification services to local election officials.

9.     The intimidation of eligible citizens who can register to vote at the DMV is causing and will cause significant harm to Plaintiffs.

10.     Plaintiff Jenifer Benn is a U.S. citizen and Rensselaer County resident who is eligible to vote. Having learned about Defendants' plan, she is unwilling to register to vote at the DMV because she fears that doing so would subject her to an ICE investigation and would be harmful to herself, her family (which includes noncitizens), and the community.

11.     Plaintiff organizations New York Immigration Coalition, Common Cause/New York, Community Voices Heard, and Citizen Action of New York are voter engagement, education, and advocacy organizations whose missions are frustrated and undermined by Defendants' conduct. They will have to divert resources toward registering voters who would have otherwise registered at the DMV, toward outreach to educate voters about their rights and dispel the fear caused by Defendants' announced policy, and toward this litigation. Common Cause/New York and Citizen Action of New York also have members who are residents of Rensselaer County and who will be adversely affected by Defendants' policy.

12.     Thus, threatened by their own County government officials, Plaintiffs now turn to the federal judiciary for protection.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1357 over Plaintiffs' causes of action under Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. 10307(b), and the First and Fourteenth Amendments to the Constitution pursuant to 42 U.S.C. § 1983. This Court may grant Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this claim occurred in this District, and under 28 U.S.C. § 1391(b)(1) because some of the parties, including all of the Defendants, reside in this District.

## PARTIES

**A.     Plaintiffs**

15.     Plaintiff **New York Immigration Coalition (NYIC)** is an umbrella policy and advocacy organization for more than 200 groups in New York State, representing the collective interests of New York's diverse immigrant communities and organizations. It has its principal place of business at 131 West 33rd St, Suite 610, New York, NY 10001.

16.     NYIC's mission is to unite immigrants, members, and allies so that all New Yorkers can thrive. It envisions a New York state that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams. NYIC pursues solutions to advance the interests of New York's diverse immigrant communities and advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups. It seeks to build the power of immigrants and the organizations that serve them to ensure their sustainability, improve people's lives, and strengthen New York State.

17.     NYIC's 200-plus members are dues-paying, 501(c)(3) nonprofit organizations that are committed to advancing work on immigrant justice, empowerment, and integration. These member groups include grassroots community groups, social services providers, large-scale labor and academic institutions, and organizations working in economic, social, and racial justice. Some of these member groups, such as Columbia County Sanctuary Movement (CCSM), work in, or have members in, the capital region of New York, including Rensselaer County. Encouraging voter registration is a vital part of the work that NYIC's members do to build the

power of immigrant communities, make their voices heard in the political process, and hold

government accountable. NYIC conducts civic engagement work in part through re-grants of

funding to member organizations for voter registration work in the New York communities they

serve.

18.     Plaintiff **Common Cause/New York** is the statewide New York chapter of

Common Cause, a nationwide non-partisan 501(c)(4) organization. Common Cause/New York's

principal place of business is New York, New York. Common Cause/New York has more than

60,000 members and activists statewide, including approximately 484 members in Rensselaer

County.

19.     Voting rights and election reform are central to Common Cause/New York's

mission of promoting open, honest, and accountable government that serves the public interest,

and empowering ordinary people to make their voices heard in the political process. Ensuring

that elections and voter registration procedures are accessible, well administered, and fair is part

of Common Cause/New York's core mission to improve civic engagement and accountability in

government.

20.     Common Cause/New York has committed, and continues to commit, substantial

resources to advocating for reforms that improve election administration in New York, such as

monitoring polling places on Election Day, documenting and analyzing voters' problems at

polling places, conducting voter registration efforts, facilitating a coalition of groups that work

on election administration and reform, and issuing reports and recommendations for the reform

of New York election law and election administration practices. Common Cause/New York

spends considerable time and resources on voter registration efforts in New York. Common

Cause/New York has expended resources assisting individuals with voter registration,

advocating for voter registration improvements, testifying at hearings, urging its membership to reach out to lawmakers to improve the registration process, and conducting press conferences and other public engagement to encourage voter registration.

21.     Plaintiff **Community Voices Heard, Inc. (CVH)** is a member-led, multi-racial 501(c)(3) nonprofit organization principally comprised of women of color and low-income families in New York State. CVH's mission is to build power to secure racial, social, and economic justice for all New Yorkers. Through grassroots organizing, leadership development, policy advocacy, and creating new models of direct democracy, CVH is creating a truly equitable New York State.

22.     CVH is working to build a society in which the governing systems foster racial, social, and economic justice, not exploitation—particularly for low-income people of color. CVH seeks a society in which all people—regardless of their race, ethnicity, religion, age, gender expression, sexual identity, citizen status, primary language, and ability—are treated with mutual respect.

23.     Voter registration is important to CVH's mission. CVH does voter registration work in parts of the Hudson Valley adjacent to the capital area, including Orange, Duchess, Rockland, Sullivan, and Ulster Counties (although not Rensselaer County).

24.     Plaintiff **Citizen Action of New York (Citizen Action)** is a non-profit, grassroots membership organization that advocates for social, racial, economic and environmental justice. Citizen Action organizes and carries out grassroots advocacy campaigns on important issues that are at the center of transforming society, including campaign finance reform, early voting, automatic voter registration, and other measures to expand access to the franchise and ensure the voices of ordinary New Yorkers are heard in our elections.

25.    Citizen Action has eight chapters and affiliates in major cities across New York State, including a capital region chapter that covers Rensselaer County. Each is a vibrant local organization with local leadership, paid professional organizing staff, a local agenda, and an active, diverse membership. At the national level, Citizen Action is affiliated with People's Action.

26.    Citizen Action has over 60,000 members and activists in the state of New York, including approximately 1,300 in Rensselaer County.

27.    Voting rights and election reform are a core part of Citizen Action's mission of promoting elections and voter registration procedures that are accessible and fair and lead to government that is representative of and responsive to the people. Citizen Action has committed, and continues to commit, substantial resources to advocating for reforms that improve election administration in New York, such as public financing of elections, early voting, and automatic voter registration. This advocacy work includes testifying at hearings; urging Citizen Action members to contact their lawmakers on important issues, including issues related to election reform; and conducting press conferences and other public engagement during which Citizen Action encourages eligible citizens to register to vote. In addition, Citizen Action devotes considerable resources to voter education and engagement programs in Rensselaer County and surrounding areas, including voter registration efforts.

28.    Plaintiff **Jenifer Benn** resides in Rensselaer County and is a U.S. citizen over the age of 18. She is eligible to register but is not registered to vote in Rensselaer County.

29.    Ms. Benn has not updated the address on her driver's license since she moved to Rensselaer County, and New York's Motor Voter program would allow her to register to vote at the Rensselaer County DMV at the same time that she updates her address.

30.     Defendants' conduct has made Ms. Benn fearful about registering to vote at the Rensselaer County DMV.

31.     Ms. Benn learned about Defendants' decision to share Motor Voter information with ICE through her community work. Hearing about Defendants' plan caused her to not want to register to vote at the Rensselaer County DMV, because she fears that it would subject her to an ICE investigation that would be harmful to herself, her family, and the community.

32.     Ms. Benn believes that an ICE investigation of herself might harm her family members, which include a naturalized citizen and a legal permanent resident, because sometimes ICE mistakenly identifies naturalized citizens as noncitizens and mistakenly subjects both citizens and legal permanent residents to detention and removal proceedings. Should such proceedings be brought against Ms. Benn's family members, her family would have to pay out of pocket for an immigration attorney, which would be a financial hardship.

33.     Ms. Benn also believes that she could be harmed by an ICE investigation, despite the fact that she is a citizen, because ICE sometimes mistakenly identifies citizens as being noncitizens and wrongfully detains and deports them. Should such proceedings be brought against Ms. Benn, her family would have to pay out of pocket for an immigration attorney, which would be a financial hardship

34.     Plaintiff Benn feels so unsafe living and registering to vote in Rensselaer County, in part due to Defendants' decision to share Motor Voter information with ICE, that she is considering moving out of Rensselaer County.

**B.     Defendants**

35.     Defendant **Rensselaer County Board of Elections** is responsible for receiving and processing applications to register to vote and for maintaining the voter registration rolls in Rensselaer County. The County Board of Elections is comprised of two commissioners, each

10

representing one of the two major political parties, and a full-time staff of equal party representation. Commissioners on the County Board of Elections are appointed by the Rensselaer County Legislature on the recommendation of each of the major political parties' County committees.

36.    Defendant **Jason Schofield** is one of two commissioners of the Rensselaer County Board of Elections. Defendant Schofield is sued in his official capacity.

37.    Defendant **Steven McLaughlin** is the County Executive of Rensselaer County. The County Executive is an elected office to which Defendant McLaughlin was elected in 2017. Defendant McLaughlin is sued in his official capacity.

38.    Defendant **Frank Merola** is the County Clerk of Rensselaer County. The County Clerk is an elected office to which Defendant Merola was first elected in 1998. As County Clerk, Defendant Merola is responsible for overseeing DMV operations in Rensselaer County, including the processing of driver's license applications and renewals. Defendant Merola is sued in his official capacity.

39.    Defendant **Michael Stammel** is the chairperson of the Rensselaer County Legislature. Defendant Stammel is sued in his official capacity. The County Legislature appoints the commissioners of the Board of Elections and appropriates funds for and, on information and belief, adopts the budget for the Board of Elections.

## FACTS

**A.    New York's Green Light Act**

40.    On July 17, 2019, Governor Andrew Cuomo of New York signed into law S1747-B, the "Driver's License Access and Privacy Act," or as it is commonly known the "Green Light Act."

41.     Most of the Green Light Act's provisions come into effect on December 14, 2019, 180 days after it was signed into law.

42.     The Green Light Act allows driver's license in New York state to be obtained with a wider range of identity documentation and without evidence of lawful presence in the United States. These licenses will state on their faces that they are "Not for Federal Purposes."

43.     The Green Light Act enhances existing privacy protections covering applications for any non-commercial driver's license by prohibiting disclosure—except to the applicant or pursuant to court order—of "[a]ny portion of any record retained by the commissioner in relation to a non-commercial driver's license or learner's permit application or renewal application that contains the photo image or [other personally identifying information] of the holder of, or applicant for, such license or permit" or of the original identity and residency documents submitted with a driver's license application.

44.     In addition, under the Green Light Act the DMV "shall not disclose or make accessible in any manner records or information that he or she maintains, to any agency that primarily enforces immigration law or to any employee or agent of such agency . . . ." If the DMV is compelled by court order to provide such information to immigration authorities, it must notify the individual who is the subject of the information.

45.     An "agency that primarily enforces immigration law" is specifically defined to "include, but not be limited to, United States immigration and customs enforcement and United States customs and border protection."

46.     The Green Light Act further provides that the commissioner of the DMV "shall require any person or entity that receives or has access to [driver's license] records . . . to certify . . . that such person or entity shall not . . . use such records or information for civil immigration

12

purposes." Such persons or entities are prohibited from further disclosing that information to a body "that primarily enforces immigration law" except in specific circumstances where the information will not be used for immigration purposes.

**B.      Motor Voter Registration in New York**

47.      Under Section 5 of the National Voter Registration Act of 1993, 52 U.S.C. § 20504, and New York Election Law § 5-212, individuals applying for or renewing a driver's license or identification card may apply to register to vote as part of that DMV transaction.

48.      Under rules promulgated by the New York State Board of Elections ("NYSBOE"), DMV offices transmit all completed voter registration applications to the appropriate county board of elections at least once a week, with more frequent transmittals in the period immediately before an election.

49.      When transmitting voter registration applications to each county board of elections, the DMV office must include, among other information, a "site code" that identifies the DMV office from which the application originated.

50.      On receiving applications, a county board of elections must review each application and "[i]f the application shall contain substantially all the required information indicating that the applicant is legally qualified to register and/or enroll as stated in his or her application, the county board of elections shall transfer all information on such application to the appropriate registration records." N.Y. Elec. Law § 5-210(8). The county board must then send applicants a notice of approval or rejection.

**C.      Rensselaer County's Announcement that It Would Turn Voter Registration Information Over to ICE for Immigration Enforcement Purposes**

51.      On July 18, 2019, Rensselaer County announced in a news release (the "Release") posted to its County Facebook page that "the Rensselaer County Board of Elections will begin to

share with U.S. Immigration, Customs and Enforcement (I.C.E.) the names and addresses of

people that have registered to vote in Rensselaer County through the Motor Voter Program . . . so

the list of names can be reviewed by the federal agency to ascertain if any of these people are in

the U.S. illegally."

52.     On information and belief, all or nearly all of the individuals who would be

subject to Defendants' plan to share Motor Voter information with ICE are eligible citizens who

lawfully registered to vote at the DMV.

53.     Defendants McLaughlin, Merola, Schofield, and Stammel (together, "Individual

Defendants") all participated in the announcement of the new policy, despite the fact that only

Defendant Schofield has any direct formal responsibility for administering voter registration.

54.     Although the Release stated that the policy to provide Motor Voter information to

ICE would be carried out by Defendant Board of Elections, the policy had not been put to the

Board for consideration or approval. On the contrary, the plan was crafted and announced with

the participation of only one of the two commissioners on the County Board of Elections

(Defendant Schofield). The other commissioner, Edward McDonough, was not consulted about

the plan and took no part in its formation or announcement. Indeed, Mr. McDonough has

publicly stated that he would not have supported the plan had he been consulted.

55.     Without the support of both commissioners, the Board of Elections, which

requires a majority vote to take any action, would not have been able to formally adopt

Defendants' plan.

**D.    Defendants' Plan Would Subject U.S. Citizens to the Risk of Erroneous
        Investigation and Detention**

56.     In announcing this policy, Defendant McLaughlin stated that "Rensselaer County

will . . . work hand and hand with the brave men and women of I.C.E. ensuring they have all the

14

tools and resources at their disposal to protect the integrity of our voting process," in order to prevent attempts "to pad the voter rolls of Democrats."

57.     Defendant Merola stated that "Having I.C.E. assist in reviewing voter registration documents" will "assist us in determining who is eligible to vote."

58.     Defendant Schofield stated that he would "fully cooperate with I.C.E. on this important matter."

59.     ICE is responsible for enforcing federal immigration laws. It plays no role in administering voter registration or elections or in enforcing election laws, and it does not offer citizenship verification services to local election officials.

60.     Moreover, even in carrying out its enforcement responsibilities, ICE makes frequent mistakes in its investigations and detainments. All too often, U.S. citizens are caught up in ICE investigations and are wrongfully detained.

61.     For example, according to one analysis, between 2006 and 2017, ICE erroneously ordered more than 3,500 U.S. citizens detained in Texas alone. And in just the two years between 2017 and 2019, 420 U.S. citizens were held in jail in Miami-Dade County, Florida pursuant to detainers issued by ICE.

62.     These detentions are based on information that is out of date or erroneous, drawing in part from databases that rely on inconsistent or old fingerprint data or state gang databases. Government audits found that, in 2017, 52,000 people were wrongly identified by the government as ineligible to work in the United States—a key indicator used by ICE to identify undocumented immigrants. This flawed data—paired with poor recording of names (particularly Latino and Asian names), typographical errors, lost records, and a practice of assuming that individuals born outside the United States are not here legally unless their databases show

otherwise—results in ICE frequently detaining U.S. citizens and disproportionately naturalized citizens of Latino or Asian origin.

63.     In some cases, ICE has deported U.S. citizens or detained them for months or even years. This has included citizens born in the United States, as well as long-naturalized citizens with no criminal history and no previous contact with ICE. In fact, ICE's practice of arresting and issuing detainers against individuals born in another county who *do not* appear in its databases, including naturalized citizens, is the subject of ongoing, and well-publicized, federal litigation.

**E.     Rensselaer County's Conduct Is Intended to and Will Intimidate Eligible Citizens from Registering to Vote**

64.     The natural and probable consequence of Rensselaer County's conduct will be to intimidate eligible citizens in the County, and perhaps elsewhere in New York state, from registering to vote at the DMV. Indeed, recent history demonstrates that Americans (regardless of immigration status) will find the County's activities intimidating and will decline to participate in the political process.

65.     For example, in 2017, thousands of voters voluntarily de-registered from voting rolls across the United States after it was reported that the Presidential Advisory Commission on Election Integrity (the "Pence-Kobach Commission") had requested that states turn over registrants' personal information. In Denver, for example, de-registrations spiked by several orders of magnitude immediately after the Pence-Kobach Commission made its announcement. And once voters de-registered, they generally did not return to the voter rolls. Voters found the disclosure of personal information to the federal government to be sufficiently frightening that they were willing to give up their right to vote to avoid it. And they did so even though, unlike ICE, the Commission had no law enforcement authority.

66.     Given ICE's role as a law enforcement agency with the power to detain and deport, the intimidating effect of the County's actions will likely be at least as severe as the intimidating effect of the Pence-Kobach Commission's data requests.

67.     Defendants' actions will have a doubly intimidating effect in immigrant communities, in which families are often of mixed immigration status—for example, families consisting of U.S.-born citizens with immigrant relatives or a combination of naturalized citizens and noncitizens. Millions of U.S. citizens live in "mixed-status" families; the U.S. Census Bureau has estimated that almost 10% of U.S. households contain at least one noncitizen. It is well documented that such families are much more wary of the possibility of coming under governmental scrutiny. For example, as recently as last year, the U.S. Census Bureau concluded that fear of the consequences of sharing immigration status information with the federal government would lead to Hispanic households—*even households containing citizens*— disproportionately not responding (or partially responding) to the census. The Bureau found this to be the case despite the fact that census data, unlike information provided to ICE, has strong privacy protections.

68.     The possibility of an investigation by ICE triggered by Defendants' disclosure of Motor Voter data is likely to lead many U.S. citizens living in such circumstances in the County—who may fear consequences not only to themselves, but to their loved ones—to forego the opportunity to register to vote at the DMV. Indeed, fear of bringing enforcement attention to noncitizen family or community members leads U.S. citizens in mixed-status families to sacrifice much more tangible benefits than voting. For example, studies have found these citizens are much less likely to report domestic violence or seek law enforcement assistance when they are the victims of crime.

69.     With ICE's history of erroneous detentions and deportations of U.S. citizens, an objectively reasonable citizen who is considering registering to vote—and particularly naturalized citizens or citizens with names more likely to overlap with entries in an ICE database—could quite rationally conclude that the risk of being mistakenly identified as a noncitizen by ICE far outweighs any benefit from voting.

70.     On information and belief, Defendants intend the natural and probable consequences of their actions: intimidating and thus deterring eligible voters from registering to vote in the County.

**F.    Rensselaer County Has No Legitimate Interest in Sharing DMV Voter Registration Data with ICE**

71.     Neither the Board of Elections nor the Individual Defendants have a legitimate interest in disclosing voter registration information received from the DMV to ICE.

72.     First and foremost, the purported justifications for the policy will not plausibly be served by the actions Defendants propose to take. Defendants stated that their goal is to obtain ICE's assistance in assessing voter eligibility, but ICE is not in the business of assisting states or localities with this task and does not have the wherewithal to do so. In fact, on July 25, 2019, Acting Director of ICE Matthew T. Albence testified before the U.S. House Committee on Appropriations that "ICE does not have the lawful authority to say that anybody is or is not a citizen."

73.     Moreover, disclosing information about those who register to vote through the Motor Voter program would violate federal and state law, undermining the legitimacy of any justification for doing so.

74.     Specifically, the NVRA prohibits state and local election officials from disclosing information that would reveal the agency or office at which an individual registered to vote, and

prohibits the use of voter information provided to the DMV for any purpose other than voter registration. *See* 52 U.S.C. §§ 20504(c), 20507(a)(6).

75. Likewise, New York law declares disclosure of information provided to the DMV for voter registration purposes to be an unwarranted invasion of privacy. N.Y. Elec. Law § 5-212(8).

76. And when it goes into effect, the Green Light Act will expressly prohibit providing DMV information to immigration authorities.

77. Defendants' plan to disclose information about individuals who register through the Motor Voter program to ICE for use in enforcing immigration law would violate all of these provisions. Defendants' stated interests in carrying out their proposed policy cannot justify actions that blatantly violate state and federal law. Their imposition on individuals' voting rights therefore constitutes an undue burden in violation of the First and Fourteenth Amendments to the U.S. Constitution.

**G.    Defendants' Actions Harm Plaintiffs**

78. Defendants' new policy of turning voter registration applications over to ICE for use in enforcing immigration laws harms Plaintiffs in numerous ways.

79. Plaintiff NYIC provides funding to its member organizations to conduct voter registration. If Defendants turn over DMV voter registrations to ICE, NYIC will have to divert more resources toward registering voters now fearful of registering with the DMV, educating the community about their rights, and dispelling the fears engendered by Defendants' actions. Already, one of NYIC's member groups, CCSM, held a regional strategy meeting less than one week after the County announced its intention to share voter registration information with ICE. At this meeting, CCSM members, including members who reside in Rensselaer County, expressed concern about the new policy, and members and staff discussed strategies and plans to

assist members and other constituents in applying for drivers' licenses and registering to vote through other channels to avoid having their information shared with ICE. Defendants' actions will also undermine NYIC's mission of advancing opportunity for immigrants, which includes naturalized citizens eligible to vote.

80.     Defendants' actions, which threaten to deter and intimidate eligible New Yorkers from registering to vote, also hamper Plaintiff Common Cause/New York's voter registration and voter protection efforts, and require it to divert resources to counteract the impact of Defendants' actions. Common Cause/New York members residing in Rensselaer County will be especially harmed. On information and belief, almost all Common Cause/New York members residing in Rensselaer County have to interact with the Rensselaer County DMV when applying for, renewing, or updating driver's licenses. In all of these transactions, Common Cause/New York's members have the opportunity to register to vote or to update their voter registration information. Under the new policy, those who do so will have their names turned over to ICE for investigation. Common Cause/New York has a direct interest in protecting the rights of its Rensselaer County members from these unlawful actions.

81.     Plaintiff Citizen Action will also be harmed by Defendants' actions. Citizen Action's organizers and activists devote a considerable amount of time and resources to voter engagement efforts in New York. Much of this work involves door-to-door canvassing and other grassroots engagement efforts with voters. Citizen Action's mission of holding government accountable depends on the ability of eligible persons to make their voices heard at the voting booth. For this reason, when Citizen Action canvassers encounter eligible citizens who are not registered to vote, they assist those individuals with registering. Registering voters reduces the time Citizen Action canvassers have to engage voters on the issues or reach more voters. When

voter registration is more accessible, more of the citizens Citizen Action seeks to engage are already registered, allowing Citizen Action to deploy more of its limited resources toward voter education and engagement. Accordingly, Defendants' scheme, which threatens to deter and intimidate eligible New Yorkers from registering to vote at the DMV, will hamper Citizen Action's voter engagement efforts and require it to divert resources to counteract the impact of Defendants' actions by helping more voters register.

82.     Citizen Action members residing in Rensselaer County will be especially harmed. On information and belief, almost all Citizen Action's members residing in Rensselaer County have to interact with the Rensselaer County DMV from time to time, whether in applying for a driver's license, renewing a driver's license, or updating the address on their driver's license. In all of these transactions, they have the opportunity to register to vote or to update their voter registration information (for example, if they have moved to a new address). Because of Defendants' threatened actions, those who do so will face the choice of declining to register—and thus being unable to vote or forced to find an alternative way to register—or having their name turned over to ICE for investigation.

83.     Similarly, Defendants' actions will have a direct impact on Plaintiff CVH's ability to encourage voter registration in the communities it serves. Defendants' policy serves as a shockwave rolling through immigrant communities, deterring eligible citizens from registering to vote at the DMV for the reasons described above. Because voter registration is core to CVH's mission, CVH will be required to divert resources to educate citizens in its area about the new policy, its limits, and its implications for voters in nearby areas. This will entail additional, unbudgeted meetings, the creation of new educational materials, and unbudgeted expenditures on

translation of those materials. This diversion of resources will hamper CVH's ability to fully serve its mission on behalf of the communities it represents.

84.     Defendants' actions have harmed Plaintiff Benn by intimidating her and preventing her from registering to vote at the DMV by conditioning her right to register on being subjected to an ICE investigation.

## CAUSES OF ACTION

### First Cause of Action
### Violation of Section 11(b) of the Voting Rights Act
### (52 U.S.C. § 10307(b))

85.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

86.     Section 11(b) of the Voting Rights Act provides that:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

87.     Defendants violated Section 11(b) of the Voting Rights Act by sharing, or publicizing that they will be sharing, Motor Voter information with ICE, thereby intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce, eligible voters from exercising their right to register to vote at the DMV.

88.     Defendants are requiring that eligible Rensselaer County voters who wish to register to vote at a DMV subject themselves to an examination or investigation by ICE. Due to known inaccuracies in ICE databases and ICE's history of issuing detainers against U.S. citizens, those investigations come with the risk of detention or deportation—even where the voter is a citizen and has done nothing wrong. Defendants' actions and statements would intimidate an objectively reasonable eligible citizen from registering to vote.

89.     ICE holds the power to conduct investigations, raid homes and workplaces, arrest and detain individuals, divide families, and deport people. ICE's databases are notoriously error-prone and out of date, and the agency's expansive powers have been mistakenly directed at U.S. citizens in the past. And citizens who live with noncitizens will not want to expose their noncitizen family members or cohabitants to possible ICE scrutiny and deportation. Rather than face the risk of such serious consequences, many eligible citizens will choose not to register to vote through New York's Motor Voter program—one of the most accessible and popular ways to register to vote in New York. Defendants' action will deter eligible citizens from using this program, resulting in many eligible citizens remaining unregistered and not participating in the political process. Accordingly, Defendants' conduct intimidates eligible citizens from exercising their fundamental right to vote in violation of Section 11(b) of the Voting Rights Act.

90.     Unless enjoined by the Court, Defendants will continue to violate Section 11(b) of the Voting Rights Act by continuing to provide ICE with voter registration information, thereby intimidating eligible citizens—especially naturalized citizens and those with noncitizens in their family or household—who have ample reason to fear ICE scrutiny and erroneous immigration enforcement actions.

**Second Cause of Action**
**Violation of the First and Fourteenth Amendments to the U.S. Constitution**
**(42 U.S.C. § 1983)**

91.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

92.     Citizens' voting rights are protected by the First and Fourteenth Amendments to the Constitution.

93.     Defendants threaten to subject U.S. citizens to unwarranted immigration investigations for exercising their right to register to vote at the DMV, without adequate justification. Defendants' plan to share Motor Voter information with ICE will burden the voting rights of citizens in Rensselaer County—including members of Plaintiff NYIC's constituent groups; members of Plaintiffs Common Cause/New York, CVH, and Citizen Action; and Plaintiff Benn—by deterring them from registering to vote at the DMV, the most popular and convenient method of registering to vote in New York, and making it more likely that these individuals will not vote at all.

94.     This burden will be more heavily felt by citizens living in immigrant communities—including recently naturalized U.S. citizens, U.S. citizens with names likely to match those in ICE databases, and citizens living with noncitizens—who are more likely to fear being targeted by ICE for investigation.

95.     Defendants' asserted interests in sharing information with ICE are a sham and cannot justify the burden on legitimate voters right to register at DMV without fear of entanglement with federal immigration authorities.

96.     ICE does not administer voter registration and does not have the ability or legal authority to verify the eligibility of individuals who register to vote through New York's Motor

Voter program. The asserted interest in having ICE assist in verifying voter eligibility thus cannot justify Defendants' plan.

97.     Moreover, the plan would run afoul of federal and state laws prohibiting disclosure of voter registration information, including the NVRA's prohibition on disclosing the identity of the agency at which an individual registered to vote, further undermining Defendants' purported justifications for the burdens their plan would impose.

98.     In the absence of any legitimate governmental purpose, Defendants' actions, taken under color of law, deprive Plaintiff Benn and organizational Plaintiffs' members in Rensselaer County of rights, privileges, or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

1.  That the Court determine that it has jurisdiction over this action;

2.  That the Court declare that the Defendants have violated Section 11(b) of the Voting Rights Act;

3.  That the Court declare that Defendants have violated the First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983);

4.  That the Court award compensatory and consequential damages in an amount to be determined at trial to compensate Plaintiffs for the injuries that they have suffered as a result of Defendants' unlawful conduct;

5.  That the Court award punitive damages as provided by law and as proved at trial to punish Defendants' unlawful and unconstitutional actions;

6. That the Court award nominal damages in recognition of the violation of Plaintiffs' legal rights;

7. That the Court award attorneys' fees and litigation costs to Plaintiffs' attorneys, pursuant to 52 U.S.C. § 10310(e), 28 U.S.C. § 2412, and all other applicable statutes;

8. That the Court preliminarily and permanently enjoin Defendants and anyone acting in privity with the Defendants from further violations of the law and the U.S. Constitution; and

9. That the Court grant all other and further relief as it may deem necessary and appropriate.

## **JURY DEMAND**

Plaintiffs demand a jury trial of all issues so triable. *See* Fed. R. Civ. P. 38.

Date: July 26, 2019

Respectfully submitted,

/s/ *Benjamin L. Berwick*
Benjamin L. Berwick
 Bar No. 518959
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
T: (202) 579-4582 | F: (929) 777-8428

Farbod Faraji
 *Pro Hac Vice Motion Forthcoming*
PROTECT DEMOCRACY PROJECT
222 Broadway, 19th Floor
New York, NY 10038
T: (202) 579-4582 | F: (929) 777-8428

Cameron Kistler
 *Pro Hac Vice Motion Forthcoming*
Jamila Benkato
 *Pro Hac Vice Motion Forthcoming*

Chiraag Bains*
 *Permanent Admission Application Forthcoming*
DĒMOS
740 6th Street NW, 2nd Floor
Washington, DC 20001
Telephone: (202) 864-2746

Brenda Wright
 *Pro Hac Vice Motion Forthcoming*
Stuart C. Naifeh
 *Pro Hac Vice Motion Forthcoming*
Miranda Galindo
 *Pro Hac Vice Motion Forthcoming*
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
Telephone: (212) 485-6055
Fax: (212) 633-2015

PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue, Suite 163
Washington, D.C. 20006
T: (202) 579-4582 | F: (929) 777-8428

ATTORNEYS FOR PLAINTIFFS

* Admitted in Massachusetts, not D.C.; practice
consistent with D.C. App. R. 49(c)(3).